UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FORD MOTOR CREDIT COMPANY
LLC,

                                    Plaintiff,                    No. 14-CV-5382 (KMK)

            -v-                                                   OPINION & ORDER

ANTHONY ORTON-BRUCE, SR.
VICTORIA ORTON-BRUCE, and
RENEE ORTON-BRUCE,

                                    Defendants.

Appearances:

Marc H. Goldberg, Esq.
Craig A. Leslie, Esq.
Phillips Lytle LLP
Albany, NY
*Counsel for Plaintiff*

Michael A. Savino, Esq.
Cozen O'Connor, P.C.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Ford Motor Credit Company LLC ("Plaintiff" or "Ford") brings this Action

against Anthony Orton-Bruce, Sr. ("Orton-Bruce, Sr."), Victoria Orton-Bruce ("Victoria"), and

Renee Orton-Bruce ("Renee," and collectively, "Defendants") for breach of contract and

fraudulent transfer pursuant to New York Debtor and Creditor Law §§ 273, 275, and 276.

(Compl. (Dkt. No. 1).)  Before the Court are the Parties' cross-Motions for Summary Judgment.

(Dkt. Nos. 32, 38.)  For the reasons to follow, Plaintiff's Motion is granted in part and denied in

part, and Defendants' Motion is denied.

I.  Background

A.  Factual Background

1.  The Agreements

In October 1990, Orton-Bruce, Sr. purchased Monroe Motors, Inc. ("Monroe"), located in Monroe, New York.  (Defs.' Statement of Undisputed Material Facts ("Defs.' 56.1") ¶ 1 (Dkt. No. 41); Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("Pl.'s 56.1 Resp.") ¶ 1 (Dkt. No. 56).)  On or about September 24, 1990, Monroe and Ford executed the Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "Wholesale Agreement" or "Wholesale Plan").  (Statement of Material Facts as to Which Ford Motor Credit Co. LLC Contends There is No Genuine Issue to Be Tried in Accordance with Local Civil Rule 56.1 of the U.S. District Court for the S.D.N.Y.) ("Pl.'s 56.1") ¶ 2 (Dkt. No. 39); Defs.' 56.1 ¶¶ 4–5.)  Monroe financed its purchase of new and used vehicles through "advances" under the Wholesale Agreement.  (Pl.'s 56.1 ¶¶ 3–4; Defs.' Resp. to Pl.'s Statement of Undisputed Facts ("Defs.' 56.1 Resp.") ¶¶ 3–4 (Dkt. No. 57).)  As vehicles were sold, Monroe was responsible for repaying the advances to Ford.  (Pl.'s 56.1 ¶ 5; Defs.' 56.1 Resp. ¶ 5.)  On the same day that Monroe and Ford signed the Wholesale Agreement, Monroe and Ford executed a Security Agreement, which granted Ford a "security interest in its furniture, fixtures, machinery, supplies and other equipment, motor vehicles, tractors, trailers, implements, service parts and accessories and other inventory of every kind, all accounts, contract rights, chattel paper, and general intangibles." (Pl.'s 56.1 ¶¶ 11–12; Defs.' 56.1 Resp. ¶¶ 11–12.)

On September 24, 1990, Orton-Bruce, Sr. executed and delivered to Ford a Continuing Guaranty, (Pl.'s 56.1 ¶ 14; Defs.' 56.1 Resp. ¶ 14), the purpose of which was "to induce [Ford] to make loans to and/or make advances under [the] Wholesale Plan," (Pl.'s 56.1 ¶ 14; Defs.' 56.1

Resp. ¶ 14; Aff. of K. Pamela Smith ("Smith Aff.") Exs. C, D (Dkt. No. 36)).  On November 12,

1990, Victoria executed and delivered an identical Continuing Guaranty to Ford.  (Pl.'s 56.1 ¶

20; Defs.' 56.1 Resp. ¶ 20.)  The Continuing Guaranties (the "Guaranties") each provided that

"this is and is intended to be the personal guaranty of payment and performance of each

individual who signs this instrument."  (Smith Aff. Exs. C, D ("Continuing Guaranties").)  The

Guaranties could be terminated

> by notice sent to [Ford] by registered mail, stating an effective date after the receipt
> of such notice by [Ford], and shall continue as to each of [the Guarantors] giving
> such notice with respect to any transaction with and any obligation of [Monroe]
> incurred prior to the effective date of termination.

(Pl.'s 56.1 ¶ 25; Continuing Guaranties.)  At no time prior to July 25, 2008 did Orton-Bruce, Sr.

or Victoria terminate the Guaranties by sending written notice, by registered mail, to Ford.  (Pl.'s

56.1 ¶ 27; Defs.' 56.1 Resp. ¶ 27.)[1]

    In December 2006, Orton-Bruce, Sr. sold his interest in Monroe to his son, Anthony

Orton-Bruce, Jr. ("Orton-Bruce, Jr.").  (Defs.' 56.1 ¶ 21; Pl.'s 56.1 Resp. ¶ 21.)  Anthony Orton-

Bruce, Jr. signed a Continuing Guaranty with Ford.  (Defs.' 56.1 ¶ 28; Pl.'s 56.1 Resp. ¶ 28.)[2]

### 2.  Default of Monroe

    Ford asserts that on July 23, 2008, it discovered that Monroe had defaulted under the

Wholesale Agreement by selling approximately 45 vehicles without paying the required

proceeds pursuant to the Wholesale Agreement.  (Pl.'s 56.1 ¶ 34.)  Defendants contend that Ford

was aware of the default earlier than July 23, 2008.  (Defs.' 56.1 Resp. ¶ 34.)  In July 2008, there

---

[1] As will be discussed, Defendants claim that the Guaranties were de facto revoked when
Plaintiff approved the sale of Monroe from Orton-Bruce, Sr. to his son, Anthony Orton-Bruce,
Jr.  (Defs.' Mem. 6–14; Defs.' Opp'n 7–17.)

[2] Plaintiff disputes that the testimony cited by Defendants supports the statement offered,
but does not appear to dispute that Orton-Bruce, Jr. signed a Continuing Guaranty with Ford.
(Pl.'s 56.1 Resp. ¶ 28.)

was initial default of approximately $161,000.  (Defs.' 56.1 ¶ 31; Pl.'s 56.1 Resp. ¶ 31.)  Ford

made a verbal request for payment to Orton-Bruce, Jr., (Defs.' 56.1 ¶ 35; Pl.'s 56.1 Resp. ¶ 35),

but the attempted electronic transfer of payment to Ford was returned for insufficient funds,

(Defs.' 56.1 ¶ 36; Pl.'s 56.1 Resp. ¶ 36).  A second electronic transfer was attempted and was

also eventually returned for insufficient funds.  (Defs.' 56.1 ¶¶ 38–39, 41; Pl.'s 56.1 Resp.

¶¶ 38–39, 41.)  Following the return of the second transfer, Thomas Grimaldi, a financial

services specialist for Ford, asked Orton-Bruce, Jr. if he could pay for the default, and Orton-

Bruce, Jr. replied that he could not.  (Defs.' 56.1 ¶ 42; Pl.'s 56.1 Resp. ¶ 42.)

On July 25, 2008, letters were sent to Orton-Bruce, Jr., Orton-Bruce, Sr., and Victoria

informing them of Monroe's default.  (Defs.' 56.1 ¶ 44; Pl.'s 56.1 Resp. ¶ 44.)[3]  At the time the

letters were sent, Ford had discovered that the amount owed to it by Monroe was $889,885.09.

(Defs.' 56.1 ¶ 44; Pl.'s 56.1 Resp. ¶ 44.)  Following receipt of the letter, Orton-Bruce, Sr.'s

attorney sent a response to Ford, notifying Ford that it was Orton-Bruce, Sr.'s understanding

"that by virtue of the sale[,] his liability with respect to [Monroe] terminated . . . and that any

guarant[y] previously executed by him . . . would no longer be an obligation of [Orton-Bruce,

Sr.]."  (Decl. of Michael A. Savino, Esq. in Supp. of Defs.' Mot. for Summ. J. ("Savino Decl.")

Ex. N (Dkt. No. 40); *see also* Defs.' 56.1 ¶ 49; Pl.'s 56.1 Resp. ¶ 49.)

Defendants assert—and Plaintiff disputes—that following the sale of the dealership and

up until the time he learned of the default, Orton-Bruce, Sr. "never discussed any of Monroe's

financial issues with his son" and "had no knowledge of the accounts maintained by Monroe."

(Defs.' 56.1 ¶¶ 26–27; Pl.'s 56.1 Resp. ¶¶ 26–27.)

---

[3] The letter was not sent to Victoria's current address.  (Defs.' 56.1 ¶ 45; Pl.'s 56.1 Resp. ¶ 45.)

### 3.  Transfer of 52 Everett Road

On November 16, 2004, Orton-Bruce, Sr. and his current wife Renee purchased property located at 52 Everett Road in Campbell, New York ("52 Everett") for $2.1 million.  (Pl.'s 56.1 ¶ 82; Defs.' 56.1 Resp. ¶ 82.)[4]

On or about September 29, 2008, Orton-Bruce, Sr. transferred his one-half interest in 52 Everett to Renee for $1.00.  (Pl.'s 56.1 ¶ 84; Defs.' 56.1 Resp. ¶ 84.)  The Parties agree that at the time of the transfer, 52 Everett was worth more than $1.00.  (Pl.'s 56.1 ¶ 87; Defs.' 56.1 Resp. ¶ 87.)  Following the transfer, Orton-Bruce, Sr. continued to reside at 52 Everett, (Pl.'s 56.1 ¶ 88; Defs.' 56.1 Resp. ¶ 88), and continued to pay for maintenance of and expenses for the property, as he had before the transfer, (Pl.'s 56.1 ¶ 89; Defs.' 56.1 Resp. ¶ 89).

The Parties dispute whether at the time of the transfer, Orton-Bruce, Sr. and Renee were aware of Orton-Bruce, Sr.'s alleged obligation to satisfy Monroe's debt to Ford.  (*Compare* Pl.'s 56.1 ¶¶ 83, 85, *with* Defs.' 56.1 Resp. ¶¶ 83, 85.)

### B.  Procedural History

Plaintiff filed the Complaint on July 17, 2014.  (Dkt. No. 1.)  Defendants filed their Answer on September 8, 2014.  (Dkt. No. 6.)  Plaintiff filed its Motion for Summary Judgment and accompanying papers on March 11, 2016, (Dkt. Nos. 32, 35–37, 39), and Defendants filed their opposition to Plaintiff's Motion and accompanying papers on April 8 and April 10, 2016, (Dkt. Nos. 53–55, 57).  Defendants filed their Motion for Summary Judgment and accompanying

---

[4] Orton-Bruce, Sr. and Victoria divorced in 1999.  (Defs.' 56.1 ¶ 63.)  At the time Defendants' submitted their Motion, Orton-Bruce, Sr. and Renee had been married for thirteen years.  (*Id.* ¶ 71.)

papers on March 14, 2016, (Dkt. Nos. 38, 40–42), and Plaintiff filed its opposition to

Defendants' Motion on April 8 and April 11, 2016, (Dkt. No. 46–48, 50, 56).[5]

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper*

*Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014)

(same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also*

*Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at

*2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on

the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim," in which case "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse*

---

[5] On April 11, 2016, Plaintiff requested permission to file a response to Defendants' counterstatement to Plaintiff's Rule 56.1 statement, (Dkt. No. 58), which the Court granted the same day, (Dkt. No. 59).  Plaintiff subsequently responded to Defendants' counterstatement on the same day.  (Dkt. No. 60.)

*Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks

omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to

create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to

'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v.

County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere

allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941,

2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing,

inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental

Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No.

1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's

goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech.

Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted)

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

B.  Analysis

1.  Breach-of-Contract Claim

Ford asserts that Monroe breached the Wholesale Agreement, that Orton-Bruce, Sr. and

Victoria breached their Guaranties, and that Ford suffered damages as a result.  (Mem. of Law in

Supp. of Ford Motor Credit Co. LLC's Mot. for Summ. J. ("Pl.'s Mem.") 9–11 (Dkt. No. 37).)

Defendants contend that Orton-Bruce, Sr.'s interest in the Wholesale Agreement and

consequently, his relationship with Ford, was terminated when Orton-Bruce, Sr. sold his interest

in Monroe to Orton-Bruce, Jr. in 2006.  (Defs.' Mem. of Law in Supp. of Their Mot. for Summ.

J. Pursuant to Fed. R. Civ. P. 56 ("Defs.' Mem.") 1–2 (Dkt. No. 42).)  Defendants argue that as a

result, the Guaranties signed by Orton-Bruce, Sr. and Victoria—which were wholly contingent

upon the continuance of the Wholesale Agreement—were nullified by the sale.  (*Id.* at 2.)

   "Under New York law, the essential elements of an action for breach of contract are: (1)

formation of a contract between the parties; (2) performance by [the] plaintiff; (3) non-

performance by [the] defendant; and (4) resulting damages to [the] plaintiff."  *Maricultura Del*

*Norte v. World Bus. Capital, Inc.*, 159 F. Supp. 3d 368, 376 (S.D.N.Y. 2015) (internal quotation

marks omitted).  Defendants do not dispute several facts: first, there existed a Wholesale

Agreement between Ford and Monroe, pursuant to which Ford advanced funds to Monroe;

second, Monroe defaulted by failing to pay Ford in accordance with the terms of this Agreement;

and third, Ford sustained damages as a result of that breach.  Thus, the question before the Court

is two-fold: do the Guaranties survive the sale of Monroe and, if so, did Defendants Orton-Bruce,

Sr. and Victoria as guarantors, breach those Guaranties?

   "A guaranty is distinguishable from other forms of surety contracts in that it is a separate,

independent contract between the guarantor and the creditor-obligee and is collateral to the

contractual obligation between the creditor-obligee and the principal-obligor."  *Fehr Bros., Inc.*

*v. Scheinman*, 509 N.Y.S.2d 304, 305–06 (App. Div. 1986).  A guaranty is interpreted pursuant

to the "ordinary principles of contract construction."  *Cooperatieve Centrale Raiffeisen-*

*Boerenleenbank, B.A. v. Navarro*, 36 N.E.3d 80, 85 (N.Y. 2015) (internal quotation marks

omitted).  Thus, "[a]ny analysis of [Defendant]s' liability under the [G]uarant[i]es must of course

begin with the words of the instruments themselves."  *Chem. Bank v. Sepler*, 457 N.E.2d 714,

715 (N.Y. 1983).  The identical Guaranties signed by Orton-Bruce, Sr. and Victoria provide that:

> each of the undersigned Guarantors hereby, jointly and severally, and
> unconditionally, guarant[e]es to [Ford], [its] successors or assigns that [Monroe]
> will fully, promptly[,] and faithfully perform, pay[,] and discharge all [Monroe]'s
> present and future obligations to [Ford]; and agrees, without [Ford] first having to
> proceed against [Monroe] . . . to pay on demand all sums due and to become due to
> [Ford] from [Monroe] and all losses, costs, attorney's fees[,] or expenses which
> [Ford] may suffer by reason of [Monroe]'s default.

(Continuing Guaranties.)  The Guaranties further provide that they "may be terminated only by

notice sent to [Ford] by registered mail, stating an effective date after the receipt of such notice

by [Ford]; but shall continue thereafter as to each of [the Guarantors] who has not given such

notice."  (*Id.*)  The Guaranties state that "[i]t is contemplated that this is and is intended to be the

personal guaranty of payment and performance of each individual who signs this instrument."

(*Id.*)

Defendants' Motion, and their opposition to that of Plaintiff, rests upon the contention

that "the Continuing Guarant[ies] [were] contingent upon the Wholesale Plan" and that the

termination of the Wholesale Plan operated as a concurrent termination of the Guaranties.

(Defs.' Mem. 14; Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. Pursuant to Fed. R.

Civ. P. 56 ("Defs.' Opp'n") 15–16 (Dkt. No. 55).)  According to Defendants, "it is undeniable

that the Continuing Guarant[ies] [were] created to supplement the terms of the Wholesale Plan,

and made wholly contingent thereon."  (Defs.' Mem. 13; Defs.' Opp'n 15.)  In response, Plaintiff

concedes that the Guaranties were executed "[i]n order to induce Ford . . . to extend financing to

Monroe under the Wholesale Agreement," (Mem. of Law in Supp. of Ford Motor Credit Co.

LLC's Mot. for Summ. J. ("Pl.'s Mem.") 4 (Dkt. No. 37); Ford Credit's Mem. of Law in Opp'n

to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 5 (Dkt. No 46)), but denies that Orton-Bruce, Sr.'s

sale of Monroe to Orton-Bruce, Jr. had any effect on his or Victoria's obligations under the

Guaranties, (*see* Pl.'s Opp'n 14–17).

      Defendants assert that "[h]ere, the change in ownership of Monroe, a sole proprietorship,

was so drastic that it itself operated to automatically terminate the continuing guaranty made by

Orton-Bruce, Sr. [16] years prior." (Defs.' Mem. 11; Defs.' Opp'n 13.)[6]  However, "[c]hange in

corporate ownership does not by itself transform a company into a new entity." *Caldor, Inc. v.

Mattel, Inc.*, 817 F. Supp. 408, 411–12 (S.D.N.Y. 1993); *see also Fehr Bros.*, 509 N.Y.S.2d at

309 ("[A] corporation is an entity endowed with a separate and distinct identity from that of its

individual members or stockholders, and that identity remains unchanged and unaffected

notwithstanding changes in the corporation's ownership.").  "A single, unlimited, continuing

guarantee, supported by consideration given once and for all time, is not automatically

---

[6] Defendants contend that following the sale of Monroe to Orton-Bruce, Jr., Orton-Bruce, Sr. "ceased any involvement with the dealership, other than some consulting work for a brief period of time." (Defs.' Mem. 11; *see also id.* at 12 (arguing that following the sale, Monroe "was run completely by Orton-Bruce, Jr. without any involvement of his father, other than some consulting work that concluded in the year prior to the default"); Defs.' Opp'n 7 (asserting Orton-Bruce, Sr. did not "have any involvement whatsoever after he sold his shares in Monroe"); *id.* at 15 ("Orton-Bruce[,] Sr. no longer owned, operated, or had anything to do with the dealership after he sold it.").)

      The Court is perplexed by how Orton-Bruce, Sr. could have "ceased *any* involvement with the dealership," while still performing "consulting work." (Defs.' Mem. 11 (emphasis added).)  While Orton-Bruce, Sr.'s involvement with Monroe following the sale may have been limited, it is disingenuous for Defendants to contend that he did not have "anything to do with the dealership" or have "any involvement whatsoever," while also acting as a consultant for the dealership. (Defs.' Opp'n 7, 15.)

      Additionally, Defendants' assertion that the consulting work "concluded in the year prior to the default," (Defs.' Mem. 11), is unclear.  If the sale of Monroe occurred in December 2006 and the default occurred in July 2008, Orton-Bruce, Sr. could have been performing consulting work throughout 2007—the calendar year prior to the default—or through July 2007—a full year before the default occurred.  In either scenario, Orton-Bruce, Sr.'s consulting work would have continued for a significant portion of the time during which Orton-Bruce, Jr. owned Monroe.

terminated by a change in the parties' relationship." *Sepler*, 457 N.E.2d at 716.  "Where . . . a guarantee is continuing, applicable to after-acquired obligations and terminable only by writing, it may not be said to have terminated due to . . . cessation of what one party may have regarded as the 'business relationship.'" *Id.*  Furthermore, "[u]nless the parties to a continuing guarant[y] provide otherwise in the writing, such a guarantee is not limited to the life of loans executed contemporaneously therewith and generally cannot expire by mere conduct[,] change of circumstances[,] or lapse of time." *USI Capital & Leasing v. Chertock*, 568 N.Y.S.2d 74, 75 (App. Div. 1991) (alterations and citation omitted).  Thus, Defendants' argument that "Defendants no longer had any ownership interest in Monroe" is unavailing.  (Defs.' Mem. Opp'n 8.)  "Personal guaranties which contain language of a continuing obligation are enforceable and survive payment of the original indebtedness." *Id.*; *see also Xerox Corp. v. Sw. Direct, Inc.*, No. 15-CV-6245, 2016 WL 3766425, at *3 (S.D.N.Y. July 8, 2016) ("[A]bsolute and unconditional guaranties 'have been consistently upheld by New York Courts.'" (quoting *Cooperatieve Centrale*, 36 N.E.3d at 85)).

    In *Fehr Bros.*, the defendant argued that changes in the name and capital structure of the debtor corporation, as well as its change to publicly held status, "served to discharge his obligations under [a] guarant[y] as a matter of right," a guaranty that the parties "had orally agreed to revoke."  509 N.Y.S.2d at 305.  The New York Appellate Division considered "under what circumstances alterations in the structure or formation of the principal obligor release the guarantor from his obligations under the guaranty." *Id.*  "The major inquiry," the court found, was "whether the changes in the entity, the debts or responsibilities of which are guaranteed, ha[d] the effect of creating a principal with a new identity and one the debts of which the guarantor never intended to guarantee when he executed the agreement." *Id.* at 307.  Relevant

factors in determining "whether the identity of the principal-debtor ha[s] survived" include:

"changes in business name, form, composition, management, or ownership, the involvement of

the guarantor in the business entity; and, whether the guarantor participated in the changes."  *Id.*

> Reversing a denial of summary judgment, the Appellate Division found that

> the changes put into motion and authorized by [the] defendant himself did not result
> in creation of an entity different from the one the debts of which were guaranteed,
> nor did the changes significantly alter the business dealings between the corporation
> and the creditor or alter the risk assumed by [the] defendant as guarantor.

*Id.* at 308–09.  The creditor at issue was "a supplier of merchandise to the debtor corporation,

and the relation between the creditor and the debtor ha[d] remained unaltered despite the changes

in corporate structure."  *Id.* at 310.  "Most significant," was the court's finding that

> even had there been an increase in the risk to the guarantor, . . . [the] defendant
> guarantor, in making a voluntary business decision which created the conditions
> causing the risk to increase and in failing to carry out the simple task of relieving
> himself of his obligations by providing written notice to [the] plaintiff of his intent
> to terminate the guarant[y], implicitly consented to that increased risk.

*Id.*  "[T]he corporation continued to request merchandise as usual and [the] plaintiff continued to

provide the merchandise on credit, relying on [the] defendant's guaranty."  *Id.*

> Here, while the ownership of Monroe changed following the sale, there was no change in

the business name or the composition of Monroe, and Orton-Bruce, Sr. undoubtedly participated

in the changes.  While it is unclear from the record the extent of Orton-Bruce, Sr.'s continued

involvement in the management of Monroe, Defendants admit that he participated in some

capacity.  Indeed, the *only* change to Monroe and its business appears to be the ownership by

Orton-Bruce, Jr. as the proprietor in place of Orton-Bruce, Sr.  Thus, it does not appear that "'a

true change in the composition and structure of the enterprise' had taken place" such that there

was a change in the identity of the principal-debtor relationship.  *Id.* at 307 (alteration omitted)

(quoting *Anti-Hydro Co. v. Castiglia*, 461 N.Y.S.2d 87, 88 (App. Div. 1983)).

In support of their argument, Defendants cite to several cases, each of which is easily distinguished from the case at hand and none of which involved the type of explicit termination provision at issue here.  (Defs.' Mem. 8–11.)  *See Teledyne Mid-Am. Corp. v. HOH Corp.*, 486 F.2d 987, 990–91 (9th Cir. 1973) (finding the defendant could not be liable for debts of a newly formed corporation); *Int'l Paper Co. v. Grossman*, 541 F. Supp. 1236, 1241 (N.D. Ill. 1982) (holding that the guarantor of a debtor corporation could not be held liable for defaults occurring after debtor merged into another corporation), *aff'd*, 725 F.3d 687 (7th Cir. 1983); *Anti-Hydro Co.*, 461 N.Y.S.2d at 88 (holding a guaranty could not be enforced as to a new corporate entity); *Worth Corp. v. Metro. Cas. Ins. Co. of N.Y.*, 255 N.Y.S. 470, 473 (App. Div. 1932) (finding the defendant was not responsible for debts following a merger).  Defendants' reference to *27th Street Associates, LLC v. Lehrer*, 772 N.Y.S.2d 28 (App. Div. 2004), is similarly unavailing. Defendants assert that in *27th Street Associates*, "despite his acknowledgment that he had not formally canceled or terminated the guaranty," (Defs.' Mem. 9; Defs.' Opp'n 11), "the plaintiff was aware that the defendant/[]guarantor did not intend to remain bound to the guaranty," (*id.*). However, as the court in *27th Street Associates* specifically held, and unlike the Guaranties at issue here, "[the] defendant was *not* required by the terms of his guaranty to provide *written notice* to [the] plaintiff of the termination of the guaranty."  772 N.Y.S.2d at 30 (emphasis added).

Defendants also cite to *Caldor, Inc. v. Mattel, Inc.* for the proposition that "a guarant[y] that contains a written revocation requirement can also be terminated by operation of law . . . where the parties intended and understood that the guarant[y] would be discharged when a particular event occurred (i.e., the sale by the guarantor of the entity it had guaranteed)."  817 F. Supp. at 413.  Yet the guaranty in *Caldor* was a *corporate* guaranty between a parent company

and a wholly-owned subsidiary.  *See id.* at 409.  Additionally, the court in *Caldor* found the terms of the guaranty ambiguous, *id.* at 411, which is not the case with the Guaranties at issue here.

Unlike the litany of distinguishable cases Defendants cite, the Court finds *Ford Motor Credit Company v. Pieroni*, No. 91-CV-254, 1995 WL 307550 (W.D.N.Y. May 17, 1995), to be instructive.  In that case, the court interpreted a continuing guaranty executed by a dealership and Ford Motor Credit Company—Plaintiff to the instant Action.  *See id.* at *1.  Ford sought to recover upon a continuing guaranty signed in 1980 by the defendants, the former president of a dealership, and his then-deceased wife.  *Id.*  The continuing guaranty, which was executed for "the sole purpose of [the dealer's] obtaining capital from Ford," was signed in connection with a security agreement for a loan, which the defendants later paid in full.  *Id.*  The parties had executed several subsequent agreements, as well as a second continuing guaranty, which the defendants argued superseded the 1980 guaranty.  The relevant language of the guaranty was identical to that at issue in this case, including the termination provision, which stated:

> This guaranty may be terminated only by notice sent to [Ford] by registered mail, stating an effective date after the receipt of such notice by [Ford]; but shall continue thereafter as to each [guarantor] who has not given such notice, and shall continue as to each [guarantor] giving such notice with respect to any transaction with and any obligation of the Dealer prior to the effective date of termination.   No termination shall be effected by the death of any [guarantor].

*Id.* (alteration and internal quotation marks omitted).  It was undisputed that the defendants never notified Ford by registered mail of their intent to terminate the continuing guaranty.  *Id.*  Twelve years after the parties signed the original continuing guaranty, Ford obtained a judgment against the dealer and sought to recover under the 1980 continuing guaranty.  *Id.* at *2.

The court held that repayment of the loan underlying the 1980 security agreement, as well as any later agreements, "whether they did or did not include guaranties by the defendants

or others, did not modify or terminate the 1980 [c]ontinuing [g]uaranty." *Id.*  Furthermore, the

court found that because the guaranty stated that "all of Ford Credit's rights are cumulative and

not alternative," "additional guaranties did nothing but further protect Ford Credit."  *Id.* (internal

quotation marks omitted).  Applied to this case, the principle endorsed in *Pieroni* undercuts

Defendants' position that Orton-Bruce, Jr.'s execution of a subsequent Continuing Guaranty is

"the most convincing piece of evidence" as Defendants contend.  (Defs.' Mem. 12; Defs.' Opp'n

14.)  Following the sale, Monroe "continued to request merchandise . . . and [Ford] continued to

provide the merchandise on credit, *relying on [Orton-Bruce, Sr.'s and Victoria's] guarant[ies]*."

*Fehr Bros.*, 509 N.Y.S.2d at 310 (emphasis added).

   Defendants' argument that Ford approved the sale and issued a new dealership number to

Orton-Bruce, Jr. is also not persuasive.  While the Court agrees that "the Continuing Guaranty

was created to supplement the terms of the Wholesale Plan" and that "the Wholesale Plan was

both properly terminated by written notice, as called for by its terms, as well as invalidated by

the parties' actions in transferring ownership to Orton-Bruce, Jr.," (Defs.' Mem. 13, 14; Defs.'

Opp'n 15, 16), that contract was between Ford and *Monroe*, and not between Ford and Orton-

Bruce, Sr. and Victoria as personal guarantors, (*see* Continuing Guaranties ("It is contemplated

that this is and is intended to be the personal guaranty of payment and performance of each

individual who signs this instrument.")).  Defendants offer no support for the statement that "the

Continuing Guarant[ies] cannot stand on [their] own."  (Defs.' Mem. 14; Defs.' Opp'n 16.)

   Nor is it persuasive that it was Orton-Bruce, Sr.'s "*position* that by virtue of the sale[,] his

liability with respect to [Monroe] terminated . . . and that any guarant[y] previously executed by

him . . . would no longer be an obligation of [Orton-Bruce, Sr.]," (Savino Decl. Ex. N (emphasis

added)), or that it was "the *understanding* of the parties that [Orton-Bruce, Sr.] would no longer

be involved with Monroe," (*id.* (emphasis added)).  "[W]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms, and resort to parol evidence is not only unnecessary but improper."  *Lee v. BSB Greenwich Mortg. L.P.*, 267 F.3d 172, 178 (2d Cir. 2001) (citation and internal quotation marks omitted)); *see Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 351 (S.D.N.Y. 2013) ("Where contract language is unambiguous, extrinsic evidence of the parties' subjective intent may not be considered."), *reconsideration denied*, 2013 WL 1759577 (S.D.N.Y. Mar. 29, 2013).  Thus, the subjective understanding of Defendants or Orton-Bruce, Jr. has no effect on the meaning of the contract. *See Picture Patents, LLC v. Aeropostale, Inc.*, 788 F. Supp. 2d 127, 136 n.4 (S.D.N.Y. 2011) ("One party's subjective understanding of a contract does not alter its unambiguous terms."), *aff'd*, 469 F. App'x 912 (Fed. Cir. 2012); *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 190 (S.D.N.Y. 2009) ("Because the meaning of the obligation is clearly spelled out within the four corners of the agreement, parol evidence about . . . what either party subjectively intended to agree to is not admissible."), *modified on reconsideration*, 642 F. Supp. 2d 206 (S.D.N.Y. 2009).  To the extent Defendants' argument is based on the unfairness of the enforcement of the Guaranties, Defendants "at all times . . . had the power to extinguish any perceived inequity: they could simply have served a written termination notice upon [Plaintiff]" pursuant to the terms of the Guaranties.  *Sepler*, 457 N.E.2d at 716; *see also Fehr Bros.*, 509 N.Y.S.2d at 310 (noting the defendant "fail[ed] to carry out the simple task of relieving himself of his obligations by providing written notice to [the] plaintiff of his intent to terminate the guaranty").

Finally, Defendants argue that "[t]he divorce decree between Orton-Bruce, Sr. and Victoria provided that Victoria was fully divested of any ownership in Monroe, and could not be

held liable for any debts of Orton-Bruce, Sr." (Defs.' Mem. 6; Defs.' Opp'n 6.) Defendants

offer no legal authority to support this argument, nor do they explain how a contract executed

between Ford and Victoria, in her capacity as a personal guarantor of Monroe, is affected by a

change in the relationship between Victoria and Orton-Bruce, Sr. As Defendants themselves

assert, "the Continuing Guaranty executed by Victoria was identical to the Continuing Guaranty

executed by Orton-Bruce, Sr., and executed simultaneously with . . . identical facts and

circumstances . . . present." (Defs.' Mem. 14; Defs.' Opp'n 17.) Thus, Victoria is similarly

liable to Ford under that contract.

Nor is it a defense that "Victoria did not read the Continuing Guaranty" or that "[s]he is

not familiar with its terms." (Defs.' Mem. 4; Defs.' Opp'n 4.) "A party to a writing is presumed

to have read and understood the document which [s]he signed." *Preston Frankford Shopping*

*Ctr. Dallas, Tx. L.P. v. Butler Dining Servs., LLC*, 757 F. Supp. 2d 248, 252 (W.D.N.Y. 2010)

(internal quotation marks omitted); *see also Marine Midland Bank, N.A. v. Idar Gem Distribs.,*

*Inc.*, 519 N.Y.S.2d 898, 899 (App. Div. 1987) ("[The defendant's] allegation that [s]he signed a

document clearly captioned 'Unlimited Continuing Guaranty' without understanding the

character of the document is wholly insufficient to establish a legal defense.").

As to the question of breach, Defendants do not dispute Plaintiff's argument that "[t]he

Continuing Guaranties provide an explicit and unambiguous promise of payment of the

obligations and debts of Monroe . . . to Ford." (Pl.'s Mem. 10.) By the terms of the Guaranties,

Orton-Bruce, Sr. and Victoria each agreed to "jointly and severally, and unconditionally"

> fully, promptly[,] and faithfully perform, pay and discharge all [Monroe]'s present
> and future obligations to [Ford]; and agrees, without [Ford] first having to proceed
> against [Monroe] . . . to pay on demand all sums due and to become due to [Ford]
> from [Monroe] and all losses, costs, attorney's fees or expenses which [Ford] may
> suffer by reason of [Monroe]'s default.

(Continuing Guaranties.)  Monroe defaulted and Ford has demanded the sums due from that default.  "In the face of clear language indicating the absolute and unconditional nature of the guaranty, [D]efendant[s] cannot escape liability by relying on changes [they] initiated for [their] benefit, which . . . did not . . . have the effect of . . . materially altering the relationship between the principal-debtor and the creditor."  *Fehr Bros.*, 509 N.Y.S.2d at 310.  Accordingly, the Court finds that Orton-Bruce, Sr. and Victoria, as continuing guarantors of Monroe's indebtedness to Ford are liable to Ford for the amount of Monroe's default.[7]  Plaintiff's Motion for Summary Judgment as to the breach-of-contract claim is granted and Defendants' Motion is denied.

### 2.  Transfer of 52 Everett

Plaintiff contends that the conveyance of 52 Everett was fraudulent and accordingly seeks to set aside the transfer.  (Pl.'s Mem. 12–13.)  In response, Defendants argue that the transfer was made "for estate planning purposes, on the advice of counsel" and that it took place "before [Orton-Bruce, Sr.] ever came to know that he may be responsible for any debt to [Plaintiff]."  (Defs.' Opp'n 18; *see also* Defs.' Mem. 16.)

New York Debtor and Creditor Law § 275 provides that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."  Section 276 further instructs "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. Debt. & Cred. Law § 276.

---

[7] It is worth noting that nowhere in Defendants' Motion or their opposition to that of Plaintiff do Defendants dispute the actual amount of Monroe's indebtedness.

18

"[T]o prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor." *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995). "Where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given." *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (quoting *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994)) (alteration and internal quotation marks omitted). "[T]he burden of proving 'actual intent' is on the party seeking to set aside the conveyance." *Id.* (some internal quotation marks omitted).

As "[d]irect evidence of fraudulent intent is often elusive," *Pen Pak Corp. v. LaSalle Nat'l Bank of Chi.*, 658 N.Y.S.2d 407, 408 (App. Div. 1997), "numerous courts have observed that a plaintiff seeking to prove fraudulent conveyance may have no way to prove the requisite fraudulent intent without circumstantial evidence from which intent to hinder, delay or defraud may be inferred," *Arista Records LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1542560, at *2 (S.D.N.Y. Apr. 21, 2011). Thus, "courts will consider 'badges of fraud,' which are circumstances that accompany fraudulent transfers so commonly that their presence gives rise to an inference of intent." *Pen Pak Corp.*, 658 N.Y.S.2d at 408 (some internal quotation marks omitted); *see also In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) ("Fraudulent intent is rarely susceptible to direct proof . . . [and] [t]herefore, courts have developed 'badges of fraud' to establish the requisite actual intent to defraud."). The "badges of fraud" courts consider include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 306–07 (S.D.N.Y. 2005).  Here, it is undeniable that certain of the badges of fraud are present.  The Parties do not dispute that on September 29, 2008, Orton-Bruce, Sr. transferred 52 Everett to his wife, Renee, for $1.00, (Pl.'s 56.1 ¶ 84; Defs.' 56.1 Resp. ¶ 84), and that following the conveyance, he continued to reside in the property, as well as pay for the property's maintenance, (Pl.'s 56.1 ¶¶ 88–89; Defs.' 56.1 Resp. ¶¶ 88–89).  The Parties do, however, dispute the timing of the transaction in relation to when Orton-Bruce, Sr. became aware of the alleged financial obligation to Ford.  (*Compare* Pl.'s 56.1 ¶¶ 83, 85, *with* Defs.' 56.1 Resp. ¶¶ 83, 85.)  While Defendants concede that Orton-Bruce, Sr. received notice of Monroe's default shortly before the transfer of 52 Everett, Defendants argue that "he considered the Continuing Guaranty to be terminated, null and void as a result of the sale of Monroe to . . . Orton-Bruce, Jr.," and responded to Ford as such.  (Defs.' Opp'n 18.)  Thus, there remains an issue of material fact as to whether the conduct took place after the "incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors." *Sullivan*, 373 F. Supp. 2d at 306.  Nor has Plaintiff provided evidence of Orton-Bruce, Sr.'s financial condition before and after the conveyance of the property sufficient for the Court to conclude that the transfer rendered Orton-Bruce, Sr. insolvent or otherwise unable to pay the alleged debt.  Finally, Defendants claim that Orton-Bruce, Sr. transferred 52 Everett to Renee for estate-planning purposes on the advice of counsel.  (*See* Defs.' Mem. 16; Defs.' Opp'n 18.)  Thus, genuine issues of triable fact remain that preclude summary judgment on Plaintiff's fraudulent transfer claim.

The Court agrees with Defendants that it is premature for the Court to rule on the fraudulent transfer claim against Renee.  In order to determine whether Plaintiff is entitled to a judgment against Renee, in her capacity as transferee of 52 Everett, the Court must first

adjudicate the fraudulent transfer claim against Orton-Bruce, Sr. Accordingly, the Court denies

both Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment

on the fraudulent transfer claim.

III. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is granted in part

and denied in part. Defendants' Motion for Summary Judgment is denied.

The Parties should inform the Court whether there are any outstanding claims as to the

amount owed to Plaintiff pursuant to the Continuing Guaranties, otherwise judgment will be

entered as to Anthony Orton-Bruce, Sr. and Victoria Orton-Bruce in the amount of

$1,678,377.77 plus interest. The Court will hold a status conference on April 7, 2017 at 10:00

a.m.

The Clerk of Court is respectfully directed to terminate the pending Motions. (Dkt. Nos.

32, 38.)

SO ORDERED.

Dated:        March 21, 2017
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

21